1  WILLIAM BLUMENTHAL
   General Counsel
2
   JANICE L. CHARTER Colo. Bar No. 12750
3  DAVID M. NEWMAN Cal. Bar No. 54218
   THOMAS DAHDOUH N.Y. Bar No. 2222370
4  Federal Trade Commission
   901 Market Street, Suite 570
5  San Francisco, CA  94103
   Phone (415) 848-5100/ Fax (415) 848-5184
6  jcharter@ftc.gov
   dnewman@ftc.gov
7  tdahdouh@ftc.gov

8  Attorneys for Plaintiff
   Federal Trade Commission
9

10          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
11              **SAN FRANCISCO DIVISION**

12

13  FEDERAL TRADE COMMISSION,

14          Plaintiff,

15                  v.                          4:08-cv-01718    VRW

16  NEXTCLICK MEDIA, LLC, a Delaware
    limited liability company,
17  dba StopSmoking180.com,                     **MEMORANDUM OF POINTS AND**
    StopSmokingResolution.com,                  **AUTHORITIES IN SUPPORT OF**
18  BeautifulSkin.com, and                      **PLAINTIFF'S APPLICATION FOR**
    OnLineDirectProducts;                       **A TEMPORARY RESTRAINING**
19                                              **ORDER, PRELIMINARY**
    NEXT INTERNET, LLC, a Delaware              **INJUNCTION, AND OTHER**
20  limited liability company;                  **EQUITABLE RELIEF**

21  KENNETH CHAN, individually and as an
    officer of NEXTCLICK MEDIA, LLC, and
22  NEXT INTERNET, LLC;  and

23  ALBERT CHEN, individually and as an
    officer of NEXTCLICK MEDIA, LLC,
24

25          Defendants.

26

27

28

TRO Memorandum

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE PARTIES, JURISDICTION, AND VENUE. . . . . . . . . . . . . . . . . . . . . . 1

       A.    The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

             1.    Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

             2.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       B.    Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  DEFENDANTS' VIOLATIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    The Free Trial Is Not Free. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

             1.    The Pitch. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

             2.    The Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.    The Continuity Program: Not Disclosed and Not Easily Cancelled. . . . . . 5

             1.    Failure to Provide Adequate Disclosure of Continuity Program. . . 5

             2.    Defendants Make Cancelling the Continuity Program Difficult, if
                   Not Impossible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.    There Is No Support for the Smoking-Cessation Product Claims. . . . . . . 9

IV.   THE COURT SHOULD ENTER THE REQUESTED RELIEF. . . . . . . . . . . . . . 10

       A.    Section 13(b) of the FTC Act Authorizes the Requested Relief. . . . . . . . 10

       B.    This Case Meets the Standard for a TRO and Preliminary Injunction. . . 11

             1.    Law Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                   a.    Misrepresentations Under the FTC Act. . . . . . . . . . . . . . . 12

                         "Free" Trial Offer. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                         Smoking-Cessation Claims. . . . . . . . . . . . . . . . . . . . . . 14

                   b.    Unfair Practices Under the FTC Act. . . . . . . . . . . . . . . . . 16

                   c.    Violations of the Electronic Fund Transfer Act. . . . . . . . . 17

             2.    The Individual Defendants are Liable for Injunctive and Monetary
                   Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3.   The Equities Weigh in Favor of Granting Injunctive Relief. . . . .   19

C.   A TRO with an Asset Freeze, an Accounting, Document Preservation, the Appointment of a Receiver, Expedited Discovery, and Immediate Access to Defendants' Business Premises, is Necessary for Effective Final Relief.   20

1.   An Asset Freeze is Necessary to Preserve the Possibility of Effective Final Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

2.   The Appointment of a Temporary Receiver Is Essential for Effective Final Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

3.   The Court Should Order Additional Ancillary Relief to Ensure that the Defendants' Assets Are Promptly Revealed and that the Court Is Fully Advised at the Preliminary Injunction Hearing. . . . . . . . . . .   23

V.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977), *cert. denied*, 438 U.S. 905 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Consumer Sales Corp. v. FTC*, 198 F.2d 404, 408 (2d Cir. 1952), *cert. denied*, 344 U.S. 912 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Floersheim v. FTC*, 411 F.2d 874 (9th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987). . . . . . . . . . . . . . . 23

*Fed. Sav. & Loan Ins. Corp. v. Sahni*, 868 F.2d 1096 (9th Cir. 1989). . . . . . . . . . . . . . 21

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . 11

*FTC v. Am. Nat'l Cellular*, 810 F.2d 1511 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . 11

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir.), *cert. denied*, 493 U.S. 954 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*FTC v. Brown & Williamson Tobacco Corp.*, 580 F. Supp. 981 (D.D.C. 1983), *aff'd in part and remanded in part*, 778 F.2d 35 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 10

*FTC v. Crescent Publ'g Group*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001). . . . . . . . . . . . . 14

*FTC v. Cyberspace.com*, 453 F.3d 1196 (9th Cir. 2006). . . . . . . . . . . . . . . . . . 13, 14, 20

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000). . . . . . . . . . . . . 22

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 21

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982). . . . . . . . . . . . . . . . 2, 10, 11, 21

*FTC v. H.N. Singer, Inc.*, 1982-83 Trade Cas. (CCH) P. 65,011 at 70,618-19 (N.D. Cal. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282 (D. Minn. 1985). . . . . . . . . . . . . . . . . . . 17

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . 14

*FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999). . . . . . . . . . . . . . . . 10

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994). . . . . . . . . . . . . 10, 11, 12, 14, 15

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997). . . . . . . . . 11, 18, 21

*FTC v. Thomsen-King & Co.*, 109 F.2d 516 (7th Cir. 1940). . . . . . . . . . . . . . . . . . . . . . 12

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . 22

*FTC v. Va. Homes Mfg. Corp.*, 509 F. Supp. 51 (D. Md.),
*aff'd*, 661 F.2d 920 (4th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*FTC v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984). . . . . . . . . . .  11, 19

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988). . . . . .  15, 19

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989). . . . . . . . . . . . . .  11, 12, 19, 20

*Goodman v. FTC*, 244 F.2d 584 (9th Cir. 1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984). . . . . . . . . . . . . . . . . . . . . .  12, 14, 15

*In re Nat'l Credit Mgmt. Group LLC*, 21 F. Supp. 2d 424 (D.N.J. 1998). . . . . . . . . . . .  22

*In re Thompson Med. Co.*, 104 F.T.C. 648 (1984), *aff'd on other grounds*, 253 U.S. App.
D.C. 18, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086. . . . . . . .  13 -14, 15

*Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied*,
507 U.S. 909 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 15

*Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . .  15

*P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261 (6th Cir. 1970). . . . . . . . . . . . . . . . . . .  23

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . .  22

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972). . . . . . . . . . . . . . . . . .  21

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987). .  11, 19

## FEDERAL STATUTES AND REGULATIONS

15 U.S.C. §§ 41-58. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

15 U.S.C. § 45(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 16

15 U.S.C. § 45(n). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

15 U.S.C. § 52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

15 U.S.C. § 53(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 10

15 U.S.C. § 55(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

15 U.S.C. § 56(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

15 U.S.C. § 1693e(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

15 U.S.C. § 1693o(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S.C. §§ 1331, 1337(a), and 1345. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

1

12 C.F.R. § 205.10(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  INTRODUCTION

The Federal Trade Commission asks this Court to halt an egregious scheme in which Defendants enroll unwitting consumers in monthly continuity plans and then make it impossible for them to cancel.  Defendants lure consumers with assurances of a free trial of stop-smoking or skin-care products.  Yet along with the supposed "free" trial product comes a full month's supply which must be returned or consumers will be charged as much as $99.95 every month for additional product.  Before they can return any product, however, consumers must contact Defendants, which Defendants make nearly impossible by failing to answer either their telephones or their email.  Many consumers find that the only way to break out of this never-ending nightmare is to cancel the credit or debit card account they thought they were providing to Defendants solely to pay a nominal shipping and handling fee for the trial product.

The Federal Trade Commission ("Commission" or "FTC") has filed a complaint pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), alleging that Defendants are engaged in false and deceptive business practices. The FTC seeks a temporary restraining order ("TRO") enjoining Defendants from continuing their deceptive practices, and ordering ancillary equitable relief, including (1) an asset freeze; (2) appointment of a receiver; (3) an accounting of all revenues, expenses, and assets; (4) limited expedited discovery; and (5) document preservation. The FTC also seeks an order to show cause why a preliminary injunction should not issue.  This equitable relief is needed to stop Defendants from causing further consumer injury and to preserve assets for consumer redress.  Without such relief, Defendants will continue to mislead consumers and may dissipate assets that could be used to redress the injury that they have caused and continue to cause.

## II.  THE PARTIES, JURISDICTION, AND VENUE

### A.    The Parties

#### 1.    Plaintiff

Plaintiff, the Federal Trade Commission, is an independent agency of the United

1   States Government created by statute.  FTC Act, 15 U.S.C. §§ 41-58.  The FTC enforces

2   Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which prohibit,

3   respectively, unfair or deceptive acts or practices, and false advertisements for food,

4   drugs, devices, services, or cosmetics in or affecting commerce.  Enforcement of the

5   Electronic Fund Transfer Act ("EFTA") is also vested in the FTC.  15 U.S.C. § 1693o(c).

6   Pursuant to the EFTA, every violation of that statute constitutes a violation of the FTC

7   Act as well.  *Id*.

8       The FTC is authorized to initiate, by its own attorneys, federal district court

9   proceedings to enjoin violations of the FTC Act and to secure such equitable relief as

10  may be appropriate in each case, including consumer redress.  *FTC v. H.N. Singer, Inc.*,

11  668 F.2d 1107, 1112-13 (9th Cir. 1982); 15 U.S.C. § § 53(b) & 56(a)(2).

12              **2.     Defendants**

13      Defendants are NextClick Media, LLC ("NextClick"), its principals Kenneth Chan

14  and Albert Chen, and its parent Next Internet, LLC ("Next Internet").[1]  Both NextClick

15  and Next Internet are limited liability companies organized in Delaware.  *Kauffman Exs.*

16  *N, O, P, Q.*  NextClick does business under a number of names including

17  StopSmoking180.com, StopSmokingResolution.com, BeautifulSkin.com, and

18  OnLineDirectProducts.  *Kauffman Exs. R, S, T.*  The addresses of both NextClick and

19  Next Internet are, or at times relevant to the FTC's complaint have been, 667 Folsom

20  Street in San Francisco, 880 Harrison Street in San Francisco, and 2525 East Charleston

21  Road, Suite 101, and 2513 East Charleston Road, Suite 102, in Mountain View.

22  *Kauffman Exs. U at 1, V, W, X, Y, Z, NN.*

23      Defendant Kenneth Chan is CEO and a member of both limited liability company

24

25      [1]    *Kauffman Ex. L at 2* (NextClick was "founded and funded" by Next Internet), *Ex.
        M at 1-2.*  References to declarations cited in this memorandum include the declarant's
26      last name followed by the paragraph number(s) or the appropriate exhibit number(s), *e.g.*,
        *Kauffman ¶ 10*, or *Kauffman Ex. L at 2.*  When there is more than one declaration for a
27      particular consumer, the name is followed by -1 or -2, to indicate the first or second
        declaration, respectively.  Personal information, including street address and financial
28      information, has been redacted from the exhibits.

1  Defendants.  *Kauffman Exs. L at 2, AA at 1, BB, CC*.  Chan formulates, directs, controls,

2  and participates in the acts and practices of NextClick, including the various acts and

3  practices set forth herein.  *Kauffman Ex. L at 2*.

4        Defendant Albert Chen is a member of NextClick and the company's president.

5  *Kauffman Exs. BB, L at 2*.  Chen formulates, directs, controls, and participates in the acts

6  and practices of NextClick, including the various acts and practices set forth herein.

7  *Kauffman Ex. L at 2*.

8        **B.**    **Jurisdiction and Venue**

9        The Court has subject matter jurisdiction over the Commission's claims pursuant to

10  28 U.S.C. §§ 1331, 1337(a), and 1345.  All Defendants transact business in the Northern

11  District of California.

12  **III.  DEFENDANTS' VIOLATIONS OF LAW**

13        Defendants' deceptive activities generally fall into three categories.  First,

14  Defendants' "free trial" offerings simply are not free.  Second, Defendants fail to

15  disclose adequately that, once consumers accept such purportedly free trials, they are

16  locked into continuity programs for which their debit and credit card accounts are

17  charged on a monthly basis.  Third, Defendants deceptively advertise their smoking-

18  cessation products as effective and superior to nicotine-based products.

19        **A.**    **The Free Trial Is Not Free**

20            **1.**    **The Pitch**

21        Since mid-2006, Defendants have operated several websites featuring "free trials"

22  of various products.  The StopSmoking180.com website offers an herbal patch that

23  Defendants advertise will help consumers stop smoking.  Defendants'

24  StopSmokingResolution.com website offers a similar product.  Defendants'

25  BeautifulSkin.com website features a package of three different skin care products

26  advertised to treat acne.

27        Consumers come to these websites in three different ways.  First, consumers

28  searching the Internet for remedies to stop smoking or for acne treatments find these

1    websites on their own.  *M. Allen-1 ¶ 2*, *McCoy ¶ 2*, *Netherton ¶ 2*.  Second, Defendants

2    send out bulk emails to consumers advertising these products.  *Kauffman Ex. B*,

3    *Carpenter ¶ 2, Craddock ¶ 2, Graves ¶ 1*.  Third, some consumers are directed to these

4    websites from other websites which offer free gift cards and other incentives to

5    consumers who will try products on a free trial basis.  *Drinkhahn ¶ 2*.

6        Both in their emails to consumers and on their websites, Defendants represent their

7    offerings as a completely free trial.  For example, a typical unsolicited email from

8    Defendants states "FREE 10 DAY SUPPLY" in large red and black block letters.

9    Directly below that line is a blue block that tells consumers to "CLICK HERE TO TRY

10   IT FREE!"  *Kauffman Ex. B at 2*.  Clicking on that hyperlink takes the consumer to one

11   of Defendants' websites.  Once on the website, the headline of the first page describes

12   the offering as a "FREE TRIAL."  The first page of both the www.StopSmoking180.com

13   website and the www.BeautifulSkin.com website repeats the word "Free" in large

14   colored print at least four times.  *Kauffman Exs. A* (StopSmoking180), *C* (BeautifulSkin

15   – "free" is stated five times).  The StopSmokingResolution.com website also states that

16   the stop smoking patch is a "FREE TRIAL," and that the consumer will receive a "NO-

17   COST 10-Day Supply."  *Kauffman Ex. A*.  After filling out the form at the top of the first

18   page on StopSmoking180, for example, a shipping information page opens up for the

19   consumer and, yet again, the consumer is confronted with the word "FREE" three times

20   and is told "FREE for 10 days.  Simply fill out the information below to start your FREE

21   trial today.  Simply pay low shipping and handling."  *Kauffman Ex. E*.

        **2.    The Misrepresentation**

23      In fact, Defendants' claim that these products can be tried for free is false.  Once a

24   consumer orders the trial, Defendants send the consumer a total of 30 days' worth of

25   smoking-cessation patches.  *Anderson Ex. 1 at 1* ("When I opened the envelope, there

26   was a 30 day supply (3 boxes), not just the 10 day free sample that was advertised."),

27   *Carpenter ¶ 3, Pesl ¶ 2*.  The same is true for the skin-care products.  *M. Allen-1 ¶ 2*.

28   Consumers can either try to return the product, or they can elect to keep it.

1    Regardless of what consumers decide to do, however, they receive nothing for free.

2    First, consumers who elect to keep all of the product receive a month's supply of the

3    products and are charged for exactly that – a month's supply of the product.[2]  Second,

4    consumers who are able to return unused product (which they must do in order to avoid

5    the full monthly charge) not only must pay the postage for returning the product, but are

6    assessed a $7.95 restocking fee as well.  *Ward Ex. 1 at 1*, *Benning Ex. 1 at 2*, *Carpenter*

7    *¶ 7.*  Only small print on the Terms and Conditions or Cancellation Policy pages of

8    Defendants' websites mentions the restocking charge, which, in the face of large print

9    claiming over and over that the trial is free, is not an adequate disclosure.  *Kauffman Exs.*

10    *G, H at 1, Z, Benning Ex. 1 at 2* ("[Defendant's return policies and restocking fee] does

11    not appear on your ad . . . . You still owe me $7.95" in refunds.)  This small print also

12    contradicts another statement on the StopSmoking180.com website that purchasers

13    unhappy with the product may return it for a "full refund."  *Kauffman Ex. J at 2* ("What

14    is the Guarantee?  Try Nicocure for 10 days.  If at any time you feel the product isn't

15    working for you, simply return the unused portion for a full refund.").  In sum, whether a

16    consumer keeps the trial product or returns it, the consumer bears some appreciable cost.

17    In no sense is it "free."

18    **B.    The Continuity Program:[3] Not Disclosed and Not Easily Cancelled**

19        **1.    Failure to Provide Adequate Disclosure of Continuity Program**

20    Consumers who agree to Defendants' "free" trial are *automatically* enrolled in a

21    continuity program which, unless consumers cancel within the prescribed time period for

22    the trial, results in the imposition of continuing monthly charges of up to $99.95 until

23    cancellation occurs.  Until recently, the only references to this program on Defendants'

24

25    [2]    The monthly charges are $99.95 for the smoking-cessation products and up to
      $69.95 for the acne product.  *M. Allen-1 ¶ 2, Anderson Ex. 1 at 1, Brown ¶ 4.*

26

27    [3]    A continuity program is a type of negative option plan.  Under this program,
      subscribers receive periodic shipments of goods without receiving prior announcements
      from sellers describing the goods, and without receiving prior notification forms.

28

1  website were buried in the "Terms and Conditions" page or appeared in microscopic type

2  at the bottom of the billing page of the website.  *Kauffman Exs. F at 2, G, H at 1, Z.*

3          In addition, Defendants lull consumers into thinking that they will have an

4  opportunity to opt *into* the program after trying the product.  Directly above the boxes in

5  which consumers input their billing information on the website, on a page which

6  consumers must access to sign up for the trial, the website asks, "Why do [Defendants]

7  need my credit card information?"  The response:  "Your 10 day trial is absolutely free!

8  Charges will only be made to your credit card if you find that StopSmoking180 is the

9  product for you *and you choose to continue* with the stop smoking 180 program for a

10  discounted membership price."  *Kauffman Ex. F at 1* (Emphasis added.)  The reality,

11  however, is far different – consumers must, in fact, take affirmative action *to avoid*

12  further charges.

13          As mentioned above, Defendants have recently made changes to their websites.

14  Even now, however, Defendants' description of the continuity program on the

15  StopSmoking180.com website is buried in small type at the bottom of a page that touts

16  the "free" nature of the offer numerous times, in substantially larger letters.  *Kauffman*

17  *Ex. DD at 2.*  In a recent email advertisement from Defendants for StopSmoking180, the

18  word "free" has the most prominent lettering, and near it appears the statement, "all you

19  pay is shipping & handling!"  *Kauffman Ex. GG at 2.*  Moreover, the BeautifulSkin and

20  StopSmokingResolution websites continue to advertise those offerings as free or

21  discounted with no disclosures whatsoever about the continuity program on the first page

22  of the websites.  *Kauffman Exs. EE, FF.*[4]

23          Defendants also have a new website promoting their Zero Nicotine product.  (*See*

24  Section C, *infra*, for a description of the various smoking-cessation products.)  On

25  www.nicotinecure.com, the front page in bold letters still states "FREE TRIAL,"

26  _____

27  [4]    The BeautifulSkin.com website has now been changed so that it offers a half-off
   trial package of the skin care products, *Kauffman Ex. FF*, and sends product every 45
28  days for $99.95 plus shipping and handling.

1   *Kauffman Ex. OO at 1*, while Defendants continue to bury the truth in fine print at the

2   bottom of a long web page. *Kauffman Ex. PP at 2*. Beyond, that, however, Defendants

3   make inconsistent statements about their continuity program. The terms and conditions

4   page essentially tells consumers that they will receive 20 more patches and be charged

5   $99.95 if they do nothing further (and then 30 patches per month thereafter, also at a

6   charge of $99.95). *Kauffman Ex. QQ*. Yet, in fine print on the ordering page, the page

7   consumers must go to in order to participate in the trial, Defendants say merely, "If you

8   are happy with the product, we will send you the rest of the month's supply...[for

9   $99.95]." *Kauffman Ex. PP at 2*. Consumers cannot be expected to anticipate silence on

10  their part as communicating happiness with the product. Thus, Defendants continue to

11  obfuscate the fact that consumers will receive additional product and be charged nearly

12  $100 unless they take affirmative, preventive action.

13      Some consumers were solicited by telephone, and even these were not told about

14  the continuity plan until after they had supplied credit card information to pay for the

15  shipping and handling for the supposedly free trial. *See Vander Meeden Ex. C at 71, 91,*

16  *128-29, 137-38*. Two consumers who were told this during the call and then wanted to

17  cancel immediately were not permitted to do so. *Vander Meeden Ex. C at 128-29, 137-*

18  *38*.

19          **2.      Defendants Make Cancelling the Continuity Program Difficult, if
                      Not Impossible**
20

21      Once consumers figure out, perhaps through receiving a month's supply of product

22  or a confirming email or finding unexplained charges on their credit or debit card

23  accounts, that they have unwittingly gotten into a continuity program which they must

24  cancel in order to avoid further charges, their difficulties have only just begun.

25  Defendants make cancelling so difficult that consumers who diligently follow the

26  instructions on the website are unable to cancel within the time period that Defendants

27  impose (generally an extremely short period of 20 to 30 days from the date of order).

28  *Atha Ex. 1, Brown ¶¶ 5, 7, Drinkhahn ¶¶ 4-10, Graves ¶¶ 3-6, Isaac Ex. 1, Klipfel Ex. 1,*

*McCoy ¶¶ 3-8*, *Pesl ¶ 3*, *Pesch Ex. 1 at 1*. Similarly, consumers who ultimately decide to continue in the continuity program, but later decide to cancel the subscription before the next monthly shipment, have a difficult time doing so. *M. Allen-1 ¶¶ 3, 6*, *Barrios Ex. 1*, *Hinderliter Ex. 1*, *Netherton ¶¶ 3-6*. Defendants erect a series of roadblocks that make it virtually impossible to return product within the given period of time. For example, Defendants will accept returns only if the consumer first has obtained an "RMA" number. In order to obtain such a number, the consumer must contact Defendants by calling them, by logging onto the "Members" section of the website, or by emailing the customer service department. *Kauffman Ex. T*. However, when consumers try to use one of these three avenues, they are routinely stymied.

Consumers who attempt to call the customer service number posted on the websites generally hear only a voice message saying that the number's mailbox is "full" and that no further messages can be left, or the telephone line simply is not answered. *K. Allen Ex. 1 at 1*, *Carpenter ¶ 4*, *Craddock ¶ 4*, *McCoy ¶¶ 3-4*, *Pesch Ex. 1 at 1*, *Varga ¶ 5*, *Law Ex. 1*, *Goddard Ex. 1 at 1*. The few consumers who were able to leave messages did not receive return calls. *M. Allen-1 ¶ 3*, *M. Allen-2 Ex. A at 2*, *Klipfel Ex. 1*, *Law Ex. 1 at 1*, *Hinderliter Ex. 1*, *Weigel Ex. 1*. The username or password that Defendants give consumers to log onto the "Members" section of the website often does not work. *M. Allen-1 ¶ 3*, *M. Allen-2 Ex. A at 1-8*, *Carpenter ¶ 4*, *Klipfel Ex. 1*, *McCoy ¶ 4 & Ex. A at 5, 7*. When consumers use email to cancel or to request a correct username or password enabling them to log on, Defendants either do not reply or send form responses saying that someone will look into the situation. *K. Allen Ex. 1*, *Atha Ex. 1*, *Carpelan Ex. 1 at 1*, *Carpenter ¶ 4*, *Drinkhahn ¶ 5*, *Farris Ex. 1*, *Klander Ex. 1*, *Netherton ¶ 4*, *Pesch Ex. 1 at 1-2* ("You can not get in touch with [defendants] to discuss anything, they make it impossible by having a number and email address that is not answered."), *Robichaud Ex. 1 at 1* ("I have tried numerous times to contact this company – they simply do not exist."), *Uyema Ex. A at 1*. Due to the cancellation roadblocks Defendants have erected, many consumers are unable to cancel within the requisite period and incur unauthorized

1    charges of up to $99.95 per month on consumers' debit or credit cards. *Anderson Ex. 1*

2    *at 1* ("[B]ecause of the $99.95 taken from our account, we now can not pay our electric

3    bill in full"), *Benning Ex. 1 at 1*, *Brown ¶ 6*, *Bulleck Ex. 1 at 1*, *Craddock ¶ 4*, *Price Ex.*

4    *1 at 1-2* ("I DID NOT get any response from beautiful skin. Not only that, but there was

5    a charge to my credit card TODAY!!! HELP") (Emphasis in Original), *Sauer Att. A at 2*,

6    *Slaughter Ex. 1 at 1*.

7          This game Defendants are playing is the final cog in their wheel of deception.

8    Unsuspecting consumers are involuntarily enrolled in a continuity plan that they are

9    unable to cancel through any of the methods Defendants give them. Consumers must

10   then resort to cancelling their credit or debit cards to avoid further charges, *M. Allen-1*

11   *¶¶ 4-5*, *Carpenter ¶ 6*, *Pesl ¶¶ 3-4*, *Uyema Ex. A at 1*, but by then, Defendants are $70-

12   $100 richer through each deception.

13         More than 100 consumers have complained to the Silicon Valley Better Business

14   Bureau ("BBB") about NextClick's practices. *Vander Meeden Ex. C*. Despite that, not

15   only did NextClick continue those practices, but it ignored a request from the BBB to

16   explain its conduct, ultimately causing the BBB to issue a consumer alert about the

17   company. *Vander Meeden ¶ 5 & Exs. A, B*.

18         **C.**    **There Is No Support for the Smoking-Cessation Product Claims**

19         To compound the injury further, the smoking-cessation products that Defendants

20   sell do not work or certainly have not been proven to work.[5] There simply is no scientific

21   evidence to support Defendants' claims that they sell "the world's most effective quit

22   smoking program," *Kauffman Exs. A at 1, B at 1, E at 1, F at 1, I, J at 1*, that their

23   products have "a 97% success rate," *Kauffman Exs. A at 1, I at 1*, or that their herbal

24   product is inherently better than nicotine-based patches. *Kauffman Exs. A at 1, D at 1, I,*

25   *J at 2*. Dr. Neal Benowitz, an expert on nicotine and nicotine addiction, examined the

26   ingredients in these products and conducted a medical literature review. In light of his

27

28         [5]    These are herbal patches called Nicocure, StopSmoking 180®, and ZeroNicotine.

1    professional experience and knowledge, he concluded that lobelia, the primary ingredient

2    in Nicocure and StopSmoking 180®, is ineffective in smoking cessation, and that none

3    of the ingredients in Defendants' products has been shown to be superior to nicotine-

4    based products for smoking cessation.  *Benowitz ¶¶ 6-12*.  Given this conclusion, Dr.

5    Benowitz had no trouble dismissing Defendants' 97% claim for its lobelia-based product.

6    *Benowitz ¶¶ 9-11*.  Thus, Defendants' claims are certainly unsubstantiated and most

7    likely false.

8

9    **IV.  THE COURT SHOULD ENTER THE REQUESTED RELIEF**

10        In its Complaint, the FTC seeks a permanent injunction and other equitable relief to

11   redress the injury caused by Defendants' deceptive practices.  To preserve the possibility

12   of effective final relief and to prevent Defendants from committing further law violations

13   pending resolution of this action, the FTC seeks a noticed TRO, including an asset

14   freeze, appointment of a receiver, limited expedited discovery, other equitable relief, and

15   an order to show cause why a preliminary injunction should not issue.

16        **A.    Section 13(b) of the FTC Act Authorizes the Requested Relief**

17        The FTC Act authorizes a district court to grant permanent injunctions to enjoin

18   violations of the Act in "proper cases."  15 U.S.C. § 53(b).[6]  Numerous courts have held

19   that Section 13(b) applies to any provision of law enforced by the FTC.[7]

20        Incident to its authority to issue permanent injunctive relief, this Court has the

21   inherent equitable power to grant all temporary and preliminary relief necessary to

22

23        [6]    The Commission proceeds under the second proviso of Section 13(b), which gives

24   the Commission the authority to initiate a permanent injunction action in district court.
     *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. H.N. Singer,*

25   *Inc.*, 668 F.2d 1107, 1110-13 (9th Cir. 1982).

26        [7]    *FTC v. Va. Homes Mfg. Corp.*, 509 F. Supp. 51, 53-54 (D. Md.) (ruling that
     Section 13(b) was appropriate to remedy violations of the Magnuson-Moss Warranty

27   Act), *aff'd*, 661 F.2d 920 (4th Cir. 1981); *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp.
     2d 25, 36-7 (D.D.C. 1999)*; FTC v. Brown & Williamson Tobacco Corp.*, 580 F. Supp.

28   981, 982 (D.D.C. 1983) (applying Section 13(b) to enjoin deceptive tar claims for
     cigarettes), *aff'd in part and remanded in part*, 778 F.2d 35 (D.C. Cir. 1985).

1    effectuate final relief, including a TRO, an asset freeze (including a freeze on individual

2    assets), appointment of a receiver, expedited discovery, a preliminary injunction, and

3    other necessary remedies.  *Pantron I*, 33 F.3d at 1102 (holding that section 13(b) "gives

4    the federal courts broad authority to fashion appropriate remedies for violations of the

5    [FTC] Act"); *Singer, Inc.*, 668 F.2d at 1113 ("We hold that Congress, when it gave the

6    district court authority to grant a permanent injunction against violations of any

7    provisions of law enforced by the Commission, also gave the district court authority to

8    grant any ancillary relief necessary to accomplish complete justice . . . .").

9        Numerous courts in the Ninth Circuit have granted or affirmed injunctive relief

10   similar to that requested here.  *See, e.g.*, *FTC v. Affordable Media, LLC*, 179 F.3d 1228,

11   1232-33 (9th Cir. 1999) (*ex parte* TRO, preliminary injunction, asset freeze, accounting);

12   *FTC  v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (*ex parte*

13   TRO, preliminary injunction); *FTC v. World Wide Factors*, 882 F.2d 344, 346 (9th Cir.

14   1989) (TRO, preliminary injunction, asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810

15   F.2d 1511, 1512-14 (9th Cir. 1987) (TRO, preliminary injunction, asset freeze,

16   appointment of receiver); *Singer*, 668 F.2d at 1109-13 (preliminary injunction and asset

17   freeze).

18       **B.    This Case Meets the Standard for a TRO and Preliminary Injunction**

19       The evidence submitted by the Commission meets the standard for issuing a TRO

20   and a preliminary injunction.  To grant the Commission a preliminary injunction to

21   enforce the FTC Act, the Court "must 1) determine the likelihood that the Commission

22   will ultimately succeed on the merits and 2) balance the equities."  *Affordable Media*, 179

23   F.3d at 1233 (quoting *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th

24   Cir. 1984)).  *See also World Wide Factors*, 882 F.2d at 346 (holding same).  The Court

25   need not consider the same factors as it would in a motion for injunctive relief among

26   private litigants.  *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75

27   (9th Cir. 1987).  *See also Affordable Media*, 179 F.3d at 1233 (holding the Commission

28   has "a lighter burden . . . than that imposed on private litigants") (quoting *Warner*, 742

TRO Memorandum                                                    Page 11 of 24

1   F.2d at 1159).  Unlike private litigants, "the Commission need not show irreparable

2   harm."  *Id.*  "Harm to the public interest is presumed."  *World Wide Factors*, 882 F.2d at

3   346.  Moreover, in balancing the equities, the public interest should receive greater

4   weight than private interests.  *Id.* at 347.[8]  As discussed herein, the evidence submitted by

5   the Commission shows both that it is likely to prevail on the merits and that the equities

6   weigh in its favor.

7                    **1.      Law Violations**

8                         a.      <u>Misrepresentations Under the FTC Act</u>

9        **"Free" Trial Offer.**  Section 5(a) of the FTC Act prohibits deceptive acts and

10  practices in or affecting commerce.  To prevail under Section 5(a),  the FTC must

11  demonstrate that "first, there is a representation, omission, or practice that, second, is

12  likely to mislead consumers acting reasonably under the circumstances, and third, the

13  representation, omission, or practice is material."  *Pantron I Corp.*, 33 F.3d at 1095

14  (citing *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164-65 (1984)); *FTC v. Gill*, 265

15  F.3d 944, 950 (9th Cir. 2001).  As set forth below, all three of these elements are

16  established sufficiently for the Court to grant a TRO and preliminary injunction.

17       Defendants' various deceptions place them squarely in violation of Section 5 of the

18  FTC Act.  As the consumer declarations and other evidence discussed above

19  demonstrate, Defendants not only omit material information from their sales pitch, but

20  make express misrepresentations as well.  They falsely tout their trial offer as free; they

21  hide the fact that taking advantage of the trial offer will result in automatic enrollment in

22  an expensive monthly continuity plan and thus charges to the consumer's credit or debit

23  card; they fail to disclose clearly that returning unused product will be at the consumer's

24  expense and result in a restocking fee; and worst of all, they make it virtually impossible

25  _____

26       [8]    This is particularly true where the evidence demonstrates that a defendant's
    business is rooted in deception, for a "court of equity is under no duty 'to protect
27  illegitimate profits or advance business which is conducted [illegally].'"  *CFTC v. British
    Am. Commodity Options Corp.*, 560 F.2d 135, 143 (2d Cir. 1977) (quoting *FTC v.
28  Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940)), *cert. denied*, 438 U.S. 905
    (1978).

TRO Memorandum                                    Page 12 of 24

1  for consumers to escape the monthly charges for a product many consumers never signed

2  up to receive in the first place.  Consumers may lose close to $100 or more before they

3  figure out what Defendants have done and what can be done to stop it.  Even consumers

4  who decide to continue with the program find down the road that they are unable to exit.

5  In addition to the financial loss, this causes great inconvenience to consumers who must

6  cancel their credit or debit cards to avoid further charges.

7      No doubt, Defendants will argue that they do disclose their continuity plan and

8  their restocking fee, which is what they often tell the BBB when consumers complain

9  after the fact.  *Benning Ex. 1 at 1-3.*  As the Ninth Circuit recently observed, however, "A

10  solicitation may be likely to mislead by virtue of the net impression it creates even

11  though the solicitation also contains truthful disclosures."  *FTC v. Cyberspace.com*, 453

12  F.3d 1196, 1200 (9th Cir. 2006).  Defendants' websites create the impression that they

13  are offering a no-strings attached, free trial offer.  Inconspicuous fine print paragraphs at

14  the bottom of web pages and buried in separate Terms and Conditions web pages are

15  insufficient to dispel that misrepresentation.  A case the *Cyberspace.com* court found

16  instructive involved a situation very similar to that presented here.  In *Floersheim v. FTC*,

17  411 F.2d 874, 876-78 (9th Cir. 1969), the appearance and repetition of certain words

18  created a deceptive impression that was not cured by a small-print disclaimer

19  contradicting that impression.  Here, the deception is not merely an impression, it is

20  overt.  The word "free" appears over and over again, and the only disclosure of a cost or

21  condition anywhere near that word is that there will be a charge of $3.95 for shipping and

22  handling.  *Kauffman Exs. A at 1, C at 1-2, D at 1.*  Indeed, Defendants even spell it out in

23  large type: "Your Cost: *Only* $3.95."  *Id*.  (Emphasis added.)  Defendants' disclosures are

24  inadequate to dispel these express claims for numerous reasons:  their placement is

25  nowhere near the claims, the claims themselves do not alert consumers to look for

26  disclosures, and Defendants are attempting to use disclosures to contradict express

27  claims.  *Cyberspace.com* 453 F.3d at 1200-01.

28      It was reasonable for consumers to rely on Defendants' claims since these claims

1   were express.  *Thompson Med. Co.*, 104 F.T.C. 648, 788-89, n. 6 (1984), *aff'd on other*

2   *grounds*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1986).

3        There can be no question that Defendants' misrepresentations and omissions were

4   material to consumers.  "A misleading impression created by a solicitation is material if it

5   'involves information that is important to consumers and, hence, likely to affect their

6   choice of, or conduct regarding, a product.'"  *Cyberspace.com,* 453 F.3d at 1201 (*quoting*

7   *Cliffdale Assocs., Inc.*, 103 F.T.C. at 165).  *See also Minuteman Press*, 53 F. Supp. 2d

8   248, 258 (E.D.N.Y. 1998) (citing same).  Here, the "free" trial claim was not just

9   implied, but was express.  Express claims are presumed to be material.  *Pantron I Corp.*,

10   33 F.3d at 1095-96; *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992), *cert. denied*,

11   507 U.S. 909 (1993).  In addition, it is self-evident that consumers would view the strings

12   attached to the supposed free trial offer as information critical to their decision as to

13   whether to subscribe to the offer.  "Information concerning prices or charges for goods or

14   services is material . . . ."  *FTC v. Crescent Publ'g Group*, 129 F. Supp. 2d 311

15   (S.D.N.Y. 2001), *citing Thompson Medical*, 104 F.T.C. at 816.

16       **Smoking-Cessation Claims.**  Section 12 of the FTC Act prohibits the

17   dissemination of any false advertisement in order to induce the purchase of food, drugs,

18   devises, services, or cosmetics.  An advertisement is "false" if it is "misleading in a

19   material respect."  15 U.S.C. § 55(a)(1).  *See also Pantron I*, 33 F.3d at 1099 ("Indeed, a

20   'false advertisement' need not even be 'false'; it need only be 'misleading in a material

21   respect'").  As with Section 5(a) of the FTC Act, to prevail under Section 12, the FTC

22   must show that there was a material representation that misled consumers acting

23   reasonably under the circumstances.  These elements are all established sufficiently to

24   warrant a TRO and preliminary injunction.

25       First, Defendants have made express claims that their smoking-cessation products

26   are very effective – "97% success rate," "world's most effective" – and better than

27   nicotine-based patches.  The FTC's expert, Dr. Benowitz, has testified that, at a

28   minimum, there is no reasonable basis for these claims, and that the claims for the patch

containing lobelia are false.  *Benowitz ¶¶ 6-12.*  Section 12 of the FTC Act is violated if an express or implied message is false or "the advertiser lacked a reasonable basis for asserting that the message was true."  *Pantron I*, 33 F.3d at 1096 (quoting *Thompson Medical*, 104 F.T.C. at 819).

Second, Defendants' misrepresentations are likely to mislead reasonable consumers.  False claims are inherently "likely to mislead."  *Thompson Med.*, 104 F.T.C. at 788, 818-19.  Moreover, reasonable consumers have no obligation to doubt the veracity of express claims, as in this case.

Third, Defendants' false claims are material.  Express misrepresentations, as well as implied claims that significantly involve health or safety, are *presumed* to be material. *Kraft*, 970 F.2d at 322; *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000). Because Defendants' claims about their products' smoking-cessation ability involve "health, safety, or other areas with which the reasonable consumer would be concerned [such as] . . . . the purpose, safety, efficacy, or cost of the product . . . . [or] its durability, performance, warranties or quality," the claims are material as a matter of law.  *Cliffdale Assocs.*, 103 F.T.C. at 182-83 (FTC's Policy Statement on Deception).  *See also Pantron I Corp.*, 33 F.3d at 1095-96 (*citing Cliffdale Assocs.* standard with approval); *Novartis,* 223 F.3d at 786 (same).[9]  Moreover, Defendants' claims are material because they go to the core reason why smokers would decide to try these products.  *See Kraft*, 970 F.2d at 322 (statement material if likely to affect consumers' decision to buy the product or service).  Unquestionably, smoking leads to increased risk for emphysema, lung cancer, heart problems, and other serious health problems.  For many smokers who want to quit, a smoking cessation product that claims a high effectiveness rate is obviously very attractive.

---

[9]     The subjective good faith of the advertiser is not a valid defense to an enforcement action brought under Section 5; instead, the FTC need merely establish that "the representations, omissions, or practices would likely mislead consumers, acting reasonably, to their detriment."  *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988).

TRO Memorandum                                                    Page 15 of 24

1    Not only is Defendants' deception likely to mislead consumers, but it may also pose

2    a significant health risk to consumers in that consumers may forgo more effective

3    smoking-cessation products to their detriment.  As the FTC's nicotine-addiction expert

4    has explained, smoking-cessation products exist (like the recently introduced Chantix

5    prescription drug) that offer some real help to smokers.  *Benowitz ¶ 9.*  Defendants'

6    actions here slowed down smokers from getting real help to try to quit smoking.

7    *Carpenter ¶ 9.*

8    Accordingly, the Commission has demonstrated a likelihood of success on the

9    merits, and a TRO and preliminary injunction prohibiting Defendants' false or

10   misleading advertisements for their smoking-cessation products are warranted.

11                           b.       Unfair Practices Under the FTC Act

12   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), makes unfair acts or practices

13   unlawful.  An unfair act or practice is one that causes or is likely to cause substantial

14   injury to consumers that is not reasonably avoidable by consumers themselves and that is

15   not outweighed by countervailing benefits either to consumers or competition.  15 U.S.C.

16   § 45(n).

17   Consumers provide Defendants with their credit or debit card account numbers to

18   pay the $3.95 shipping and handling fee for the trial product.  *Kaufman Exs. F at 1, G at*

19   *2.*  Defendants then use these same account numbers to assess dramatically higher

20   charges for the continuity plan that, as discussed above, is inadequately disclosed.  *See*

21   *supra* Section III. B. I.  Consumers unable to cancel the plan due to Defendants' refusal

22   to communicate with them are charged despite their attempts to cancel.  *See supra*

23   Section III. B. 2.  These consumers did not authorize the charges and, thus, were not able

24   to avoid them.  *See supra* Section III. B. 2.; *see, e.g., Higby Ex. 1 at 1-2.*  Moreover, in

25   many cases, Defendants made it impossible for consumers to avoid them.  *See supra* at

26   Section III. B. 2.  Since there can be no countervailing benefits associated with

27   Defendants' behavior, the assessment of these charges is a classic case of an unfair

28   practice under the FTC Act.

TRO Memorandum                                                    Page 16 of 24

1    c.    Violations of the Electronic Fund Transfer Act

2    Because these charges were not authorized, those assessed using a debit card

3    account number violate the Electronic Fund Transfer Act ("EFTA").  Section 907(a) of

4    the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized electronic fund transfer

5    from a consumer's account may be authorized by the consumer only in writing, and a

6    copy of such authorization shall be provided to the consumer when made."  Section

7    205.10(b) of Regulation E, 12 C.F.R. § 205.10(b), the regulation issued by the Federal

8    Reserve Board to implement EFTA, similarly provides that "[p]reauthorized electronic

9    fund transfers from a consumer's account may be authorized only by a writing signed or

10   similarly authenticated by the consumer.  The person that obtains the authorization shall

11   provide a copy to the consumer."  Defendants assessed these charges without obtaining

12   written authorization from consumers and thus violated EFTA.

13         **2.    The Individual Defendants are Liable for Injunctive and**
           **Monetary Relief**
14

15   The Commission is also likely to succeed in demonstrating that the individual

16   Defendants are liable for the business Defendants' deceptive practices.

17         An individual may be held liable under the FTCA for corporate practices if
           the FTC first can prove the corporate practices were misrepresentations or
18         omissions of a kind usually relied on by reasonably prudent persons and that
           consumer injury resulted.  *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282
19         (D.Minn. 1985).  Once corporate liability is established, the FTC must show
           that the individual defendants participated directly in the practices or acts or
20         had  authority to control them.  *Kitco*, 612 F. Supp. at 1292; *FTC v.  H.N.*
           *Singer, Inc.*, 1982-83 Trade Cas. (CCH) P. 65,011 at 70,618-19 (N.D. Cal.
21         1982).  Authority to control the company can be evidenced by active
           involvement in business affairs and the making of corporate policy, including
22         assuming the duties of a corporate officer.  *Kitco*, 612 F. Supp. at 1292; *see*
           *e.g.*, *Consumer Sales Corp. v. FTC*, 198 F.2d 404, 408 (2d Cir. 1952), *cert.*
23         *denied*, 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953).

24

25   *FTC v. Amy Travel Service*, 875 F.2d 564, 573 (7th Cir.), *cert. denied*, 493 U.S. 954

26   (1989).  As discussed above, NextClick has engaged in misrepresentations that were

27   reasonably relied upon by consumers and which caused consumer injury.  Thus, the first

28   requirement for demonstrating individual liability is met.

1    As for the second requirement, both individual defendants are in positions to

2    exercise control of NextClick.  Kenneth Chan is the CEO of NextClick, and Albert Chen

3    is its president.  They are the only members of the NextClick limited liability company.

4    *See supra*, Section II. A. 1.  Obviously, this is a closely-held company with these two at

5    the helm.

6    To obtain restitution from an individual for corporate misconduct, the FTC must

7    also show that an individual had knowledge of the deception.  *Publ'g Clearing House*,

8    104 F.3d at 1171.  Knowledge can be demonstrated by showing actual knowledge of

9    material misrepresentations, reckless indifference to the truth or falsity of the

10   misrepresentation, or an awareness of a high probability of fraud along with an

11   intentional avoidance of the truth; the Commission need not show intent to defraud.  *Id.*

12   The "degree of participation in business affairs is probative of knowledge."  *Amy Travel*,

13   875 F.2d at 574.  NextClick's website describes Kenneth Chan as "responsible for the

14   overall vision, strategy, and direction of the company," and states that Albert Chen's

15   expertise "is in marketing, product development, sales management and business

16   development for software and systems companies."  *Kauffman Ex. L at 2.*  These

17   descriptions admit that these individuals are responsible for setting the direction of the

18   company.  It is highly likely, therefore, that they had a hand in crafting, or at least

19   approving, the language on the websites that is at the heart of the promotions for the

20   smoking-cessation and skin products.

21   It also seems likely that they would be aware of the scores of consumer complaints

22   forwarded to the company by the Better Business Bureau, the BBB's request for

23   modification of some of NextClick's advertising, the failure of NextClick to respond to

24   that request, and the subsequent failure of NextClick to address additional complaints

25   forwarded by the BBB, *Vander Meeden ¶ 6*, since these sorts of interactions with an

26   entity like the BBB would be significant to any business, particularly a closely-held

27   business such as NextClick.  These factors provide strong indications of "knowledge," as

28   defined above, by the individual defendants that consumers were being misled by

TRO Memorandum                                                    Page 18 of 24

1    NextClick's website.

2    Moreover, a very egregious aspect of the matter at issue is the carefully constructed

3    scheme to make it impossible for consumers to contact the company to cancel the

4    continuity plan in which they became unwittingly enrolled.  The notion that the two

5    individuals running this company were not aware of and, indeed, responsible for this

6    scheme defies credulity.  At a minimum, Defendants Chan and Chen would have to be

7    intentionally avoiding the truth not to have that awareness.  Such intentional avoidance

8    satisfies the knowledge requirement for holding an individual liable.

9            **3.    The Equities Weigh in Favor of Granting Injunctive Relief**

10    Once the FTC has shown a likelihood of success on the merits, the Court must

11    balance the equities, assigning greater weight to the public interest than to Defendants'

12    private concerns in determining whether to grant injunctive relief.  *World Wide Factors*,

13    882 F.2d at 347; *Warner Communications*, 742 F.2d at 1165 ("Although private equities

14    may be considered, public equities receive far greater weight.").  *See also World Travel*,

15    861 F.2d at 1030.   The equities strongly support immediate injunctive relief.  As noted

16    above, the public equities in favor of halting law violations are much stronger than the

17    private equities, especially where, as here, the activities are deceptive.  The evidence,

18    discussed below, demonstrates that Defendants are still causing injury through their

19    deceptive trial offer and product claims.   Even in the absence of such evidence, their

20    prior violations give rise to an "inference . . . that future violations are likely to occur."

21    *Odessa*, 833 F.2d at 176.

22    In spite of receiving numerous consumer complaints forwarded by the BBB,

23    *Vander Meeden Ex. C*,  Defendants continue to tout the "free" nature of the trial offer of

24    their smoking-cessation products.  *Kauffman Exs. DD at 2*, *EE at 1*, *FF at 2*, *GG at 2*.

25    The few changes Defendants have made in their websites do not cure their deceptions.

26    For example, Defendants have altered their smoking-cessation product website to include

27    at the bottom of the first page a disclosure about the automatic continuity plan enrollment

28    and restocking fee.  This language, however, is buried in a small-print paragraph of

TRO Memorandum                                                    Page 19 of 24

1  legalistic caveats, despite the fact that this information is very material to consumers.

2  The emphasis everywhere continues to be on the word "free," and the website continues

3  to proclaim, "Your Cost: Only $3.95." *Kauffman Ex. DD at 2.* Accordingly, the

4  alteration still fails to cure the net impression of the website, which is that the product

5  trial is a no-strings attached, free offer. "A solicitation may be likely to mislead by virtue

6  of the net impression it creates even though the solicitation also contains truthful

7  disclosures." *Cyberspace.com,* 453 F.3d at 1200.

8       Moreover, the true nature of Defendants' scheme is exposed by their failure to

9  respond to consumers attempting to extricate themselves from the continuity plan web in

10 which they have been ensnared. This practice has spanned too long a period of time for

11 it to be a mistake or a mere operational problem.

12      Because Defendants are on notice that consumers have been deceived and harmed

13 by their practices, yet have continued to maintain a deceptive website and ignore

14 consumer attempts to cancel, it is likely that, without action from this Court, Defendants

15 will continue to mislead consumers. The public interest in an injunction is therefore

16 high. As to Defendants' interests, the FTC's proposed temporary restraining order

17 restrains Defendants only from engaging in this illegal conduct, and protects assets from

18 dissipation. Such a restriction does not work an undue hardship on Defendants, for they

19 have no legitimate interest in persisting with conduct that deceives consumers and

20 violates federal law. *See World Wide Factors*, 882 F.2d at 347 (upholding district court

21 finding of "no oppressive hardship to defendants in requiring them to comply with the

22 FTC Act, refrain from fraudulent representation or preserve their assets from dissipation

23 or concealment").

24 **C.    A TRO with an Asset Freeze, an Accounting, Document Preservation, the Appointment of a Receiver, Expedited Discovery, and Immediate**
25 **Access to Defendants' Business Premises, is Necessary for Effective Final Relief**

26
27 **1.    An Asset Freeze is Necessary to Preserve the Possibility of Effective Final Relief**

28      As part of the final recovery in this case, the Commission seeks redress for the

consumers who were defrauded by Defendants' misrepresentations.  To preserve the possibility of such relief, and to ensure that funds do not disappear during the course of this litigation, the Commission requests that this Court order a temporary freeze of Defendants' assets.  A district court's authority to enter orders preserving Defendants' assets is ancillary to its equitable authority to order consumer redress.  *Singer*, 668 F.2d at 1113; *Gem Merch.*, 87 F.3d 466, 468-69 (11th Cir. 1996).  A court may impose an asset freeze based on the mere possibility of dissipation of assets.  *Fed. Sav. & Loan Ins. Corp. v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989).[10]  That possibility is present where, as here, Defendants have engaged in pervasive fraudulent activity.  *See Publ'g Clearing House*, 104 F.3d at 1171; *Singer*, 668 F.2d at 1113; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).

In this case, freezing Defendants' assets is essential to prevent their dissipation or waste of assets during the pendency of this litigation.  Defendants' systematic deception provides them with the motive and the opportunity to conceal and dissipate assets.  Indeed, Defendants' contact with consumers consists not only of deceptive ads designed to extract money from consumers, but a course of conduct clearly designed to frustrate consumers' ability to avoid having unauthorized charges billed to their credit or debit card accounts.  Any hardship on Defendants caused by the freezing of assets and related equitable relief would be temporary, and is greatly outweighed by the public's interest in preserving assets obtained through Defendants' fraud.

## 2.    The Appointment of a Temporary Receiver Is Essential for Effective Final Relief

As another means to maintain the status quo, Plaintiff seeks the appointment of a

---

[10]    In *Sahni*, the Ninth Circuit reversed a district court's denial of an asset freeze where the district court had required a showing that asset dissipation was not only possible but likely.  868 F.2d at 1097.  The court held that "[s]o long as the district court continued to believe that FSLIC was likely to succeed on the merits, the court should only have required FSLIC to show a possibility of dissipation of assets."  *Id.*  Requiring a showing of a "likelihood" of dissipation "placed an unnecessarily heavy burden on FSLIC."  *Id.*

temporary receiver, who will locate and preserve corporate assets and records to obviate

the threat of destruction, dissipation, or secretion.  A temporary receiver is appropriate

"where necessary to prevent the dissipation of a defendant's assets pending further action

by the court" and to help preserve the status quo to allow an examination of the

defendant's past business transactions.  *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436

(2d Cir. 1987).  The appointment of a receiver is a well-established equitable remedy

available to the Court in civil enforcement proceedings for injunctive relief.  *See, e.g.,*

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984).  *See also FTC v.*

*Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 533-34 (S.D.N.Y. 2000) (permanent

injunction, ordering receiver to wind up the business affairs of corporate defendants); *In*

*re Nat'l Credit Mgmt. Group LLC*, 21 F. Supp. 2d 424, 463 (D.N.J. 1998) ("[a]

temporary receiver can preserve records and make an accounting that will assist in (1)

identifying the assets of the Defendants, (2) determining the size and the extent of the

fraud, and (3) identifying the individuals injured").

A receiver is necessary here because, as shown above, Defendants' business is

permeated by fraud, and because of the demonstrable risk that their misconduct will

continue.  Defendants' pervasive misconduct also shows that assets would likely be

dissipated absent appointment of a receiver.  Given that there may be other aspects to

Defendants' business,[11] a receiver is necessary to untangle the Defendants' financial

affairs.

Because there seems to be little distinction between NextClick and Next Internet,

the FTC requests that the temporary receivership extend to both companies.  While

NextClick and Next Internet are separate entities, there is much evidence to indicate that

Next Internet and NextClick are closely intertwined.  The two companies share the same

office spaces.  *Kauffman Exs. U*, *V*, *W*, *X*.  Both individual Defendants are involved in

the two companies.  *Kauffman Exs. L at 2*, *AA*, *MM*.  A recent press release on

---

[11]    Next Internet claims on its website to have other Internet companies up and
running, in addition to NextClick.

TRO Memorandum

1 NextClick's website announced that Next Internet had provided NextClick with a $4

2 million infusion of cash on July 4, 2007.  *Kauffman Ex. HH*.  Finally, at least four on-line

3 job postings for the target companies have spoken interchangeably of the employer as

4 NextClick and Next Internet.  *Kauffman Exs. II at 1-2, JJ at 1, KK at 1, LL at 1*.

5     The legal fiction that two companies are separate entities should not stand in the

6 way of a remedy that comports with reality.

7       [T]he law is clear that where a parent possesses latent power, through
        interlocking directorates, for example, to direct the policy of its subsidiary,
8       where it knows of and tacitly approves the use by its subsidiary of deceptive
        practices in commerce, and where it fails to exercise its influence to curb the
9       illegal trade practices, active participation by it in the affairs of the subsidiary
        need not be proved to hold the parent vicariously responsible.  Under these
10      circumstances, complicity will be presumed.  See Goodman v. Federal Trade
        Commission, 244 F.2d 584, 590 (9th Cir. 1957).
11
*P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 270 (6th Cir. 1970).

12
13      **3.      The Court Should Order Additional Ancillary Relief to Ensure
                that the Defendants' Assets Are Promptly Revealed and that the
14              Court Is Fully Advised at the Preliminary Injunction Hearing**

15    To locate assets wrongfully obtained from consumers and ensure that the fullest

16 information is available for the preliminary injunction hearing, the FTC asks the Court to

17 order financial reporting by Defendants.  The financial reporting provisions in the

18 proposed TRO reflect the Court's broad and flexible authority in equity to grant

19 preliminary and emergency relief in public interest cases.  *See Porter v. Warner Holding

20 Co.*, 328 U.S. 395, 398 (1946); *Fed. Sav. & Loan Ins. Corp.  v. Dixon*, 835 F.2d 554, 562

21 (5th Cir. 1987).

22    The prompt and full disclosure of the scope and financial status of Defendants'

23 business operations is needed to ensure that the Court is fully advised regarding:  (1) the

24 full scope of Defendants' law violations; (2) the total amount of consumer injury; (3) the

25 extent of Defendants' ill-gotten gains; and (4) the nature, extent, and location of

26 Defendants' assets.  For these reasons, the proposed TRO also requires Defendants to

27 produce certain financial records and information on short notice.

28

TRO Memorandum                                                    Page 23 of 24

1

## V.  CONCLUSION

2      Defendants engage in pervasive, pernicious practices to extract payment from

3 consumers through means of false representations and other unfair behavior.  For the

4 reasons set forth above, this Court should grant the requested TRO with asset freeze,

5 appointment of a receiver, and order to show cause why a preliminary injunction should

6 not issue.

7

8                                        Respectfully submitted,

9

10                                       WILLIAM BLUMENTHAL

11                                       General Counsel

12

13 DATED: <u>March 31</u>, 2008              _____/S/_____

14                                       JANICE L. CHARTER
                                         DAVID M. NEWMAN
15                                       THOMAS DAHDOUH
                                         Attorneys for Plaintiff
16                                       Federal Trade Commission
                                         901 Market Street, Suite 570
17                                       San Francisco, CA 94103
                                         (415) 848-5100 (phone)
18                                       (415) 848-5184 (facsimile)

19

20

21

22

23

24

25

26

27

28